**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANE DOES I-IV and JOHN DOES I and II, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 17 C 3944 |
| v. | ) ) | |
| KANE COUNTY, SHAWN LOOMIS, and APEX3 SECURITY LLC, | ) ) ) | |
| Defendants. | ) ) | Consolidated with |
| VICTORIA WEILAND and DEANNA CHRONES, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 17 C 6111 |
| v. | ) ) | |
| KANE COUNTY, SHAWN LOOMIS, APEX3 SECURITY, LLC, and NORTHWESTERN MEDICINE DELNOR HOSPITAL, | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

The present consolidated lawsuits are based on a tragic incident that took place at

Defendant Northwestern Medicine Delnor Hospital (hereinafter "Delnor Community Hospital")

in Geneva, Illinois, where a Kane County Correctional Officer lost control of pretrial detainee

Tywon Salters, who then took nurses hostage at gunpoint and physically assaulted two of the

nurses. After a three-hour hostage standoff, Kane County S.W.A.T team members shot and

killed Salters. Four nurses, two of their husbands ("Doe Plaintiffs"), and two hospital patients,

Victoria Weiland and Deanna Chrones ("Patient Plaintiffs"), have brought claims against Defendants Delnor Community Hospital, Kane County, Kane County Correctional Officer Shawn Loomis, and Apex3 Security based on their Fourteenth Amendment substantive due process right to bodily integrity and common law negligence pursuant to the Court's original and supplemental jurisdiction. 28 U.S.C. §§ 1331, 1367(a).[1]

In particular, in their Second Amended Complaint, the Jane Doe Plaintiffs bring the following claims: (1) substantive due process against Defendant Loomis (Counts I, VII, XI, XIV); and (2) common law negligence against Apex3 Security (Counts III, IX, XII, XV). The John Doe Defendants bring loss of consortium claims based on their wives' substantive due process claims (Counts II and VIII) and common law negligence claims (Counts IV and X). The Doe Plaintiffs also bring indemnification claims against Kane County in the remaining counts pursuant to 745 ILCS 10/9-102. Similarly, in their First Amended Complaint, the Patient Plaintiffs bring: (1) a substantive due process claim against Defendant Loomis (Count I); (2) a negligence claim against Defendant Apex3 Security (Count II); and (3) a negligence claim against Defendant Delnor Community Hospital (Count III). The Patient Plaintiffs also bring an indemnification claim under 745 ILCS 10/9-102 against Kane County (Count IV).

Before the Court are Defendants' motions to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants in part Defendant Kane County's motion to dismiss in relation to the John Doe constitutional loss of consortium claims alleged in Counts II and VIII of the Second Amended Complaint, along with the John Doe Plaintiffs' indemnification claims related to their constitutional loss of consortium in Counts VI and X. The Court denies the remainder of Defendant Kane County's motions to dismiss.

---

[1]  On February 13, 2018, the Executive Committee for the Northern District of Illinois reassigned these consolidated lawsuits to the Court due to Judge Samuel Der-Yeghiayan's retirement from the bench.

Further, the Court denies Defendant Loomis' and Defendant Apex3 Security's motions to dismiss in their entirety. Last, the Court grants Defendant Delnor Community Hospital's motion to dismiss Count III of the Patient Plaintiffs' First Amended Complaint.

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014); *see also Hill v. Serv. Emp. Int'l Union,* 850 F.3d 861, 863 (7th Cir. 2017). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pursuant to the federal pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). When determining the sufficiency of a complaint under the plausibility standard, courts accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor. *See Cannici v. Vill. of Melrose Park,* 885 F.3d 476, 479 (7th Cir. 2018).

## BACKGROUND

The Doe Plaintiffs' Second Amended Complaint and the Patient Plaintiffs' First Amended Complaint allege that Tywon Salters served a sentence in the Illinois Department of Corrections for Class 2 felonies and was released on parole in October 21, 2016. (R. 24, Second Am. Compl. ¶¶ 15-16; R. 57, First Am. Compl. ¶¶ 11-12.) Less than five months later, on March

11, 2017, law enforcement officers arrested Salters and booked him into the Kane County Jail on felony charges related to his receiving and possessing a stolen vehicle. (Second Am. Compl. ¶ 17; First Am. Compl. ¶ 13.) Based on Salters' violent past, the Kane County State's Attorney successfully argued against any bond reduction that would allow Salters out of custody. (Second Am. Compl. ¶ 19.) At that time, Kane County Correctional Officers knew that Salters took medications for his mental conditions and that Salters was a member of the Black Disciple street gang. (Second Am. Compl. ¶¶ 15, 20; First Am. Compl. ¶¶ 10, 14.)

On May 7, 2017, while in custody, Salters ingested hydrogen peroxide, after which Kane County Correctional Officers transported him to Delnor Community Hospital, and once released, Kane County officials placed him on suicide watch at the Kane County Jail. (Second Am. Compl. ¶¶ 21-23; First Am. Compl. ¶¶ 15-16.) The next day, Salters ingested a jail-issued sandal and liquid cleaner, and, once again, Kane County Correctional Officers transported him to Delnor Community Hospital for medical treatment. (Second Am. Compl. ¶¶ 24-25, First Am. Compl. ¶¶ 17-18.) On May 9, 2017, the hospital transferred Salters to the medical-surgical unit on the third floor of the hospital where he stayed until the incident that took place on May 13, 2017. (Second Am. Compl. ¶¶ 26-27; First Am. Compl. ¶¶ 19-20.) Plaintiffs assert that during that time period, Kane County Correctional Officers were aware that Salters was combative, uncooperative, and manipulative. (Second Am. Compl. ¶ 32; First Am. Compl. ¶¶ 22-23.) Further, Plaintiffs state that Kane County Correctional Officers, including Defendant Loomis, were aware that Salters was a flight risk and posed a serious danger to the hospital staff, nurses, and patients. (Second Am. Compl. ¶ 33; First Am. Compl. ¶ 24.)

Plaintiffs allege that pursuant to the polices of the Kane County Sheriff's Office, Kane County Correctional Officers were required to protect hospital staff, nurses, and patients from

4

Salters while he was at Delnor Community Hospital. (Second Am. Compl. ¶ 42; First Am. Compl. ¶ 37.) Also, armed Kane County Correctional Officers were to guard and maintain control over Salters at all times while he was a patient, including that Salters' leg was to remain shackled to his hospital bed. (Second Am. Compl. ¶¶ 37-39; First Am. Compl. ¶¶ 32-34.)

On May 8, 2017, while in the emergency room of Delnor Community Hospital, Salters asked to use the bathroom, at which time the Kane County Correctional Officer guarding him released Salters from his shackles, vacated the room, and left Salters alone with a nurse while he used the toilet. (Second Am. Compl. ¶ 46; First Am. Compl. ¶ 41.) The hospital notified the Kane County Sheriff's Office and Apex3 Security of this incident. (Second Am. Compl. ¶ 46; First Am. Compl. ¶¶ 41-42.) On both May 11 and May 12, 2017, Correctional Officers unshackled Salters and allowed him to walk unrestricted through the hallways on the third floor of the hospital. (Second Am. Compl. ¶¶ 51, 52; First Am. Compl. ¶¶ 47, 48.) Correctional Officers also allowed Salters' unrestricted use of the telephone in his hospital room. (Second Am. Compl. ¶ 49; First Am. Compl. ¶ 45.)

On the morning of May 13, 2017, nurses observed Kane County Correctional Officers sitting in Salters' hospital room using their electronic devices while Salters was unshackled. (Second Am. Compl. ¶¶ 53-54; First Am. Compl. ¶¶ 49-50.) Sometime thereafter, Correctional Officer Defendant Loomis began guarding Salters and removed Salters' leg shackle more than once so that Salters could use the toilet. (Second Am. Compl. ¶¶ 57, 59; First Am. Compl. ¶¶ 51-52.) After unshackling Salters, Defendant Loomis did not restrain or shackle Salters after he used the bathroom. (Second Am. Compl. ¶¶ 58, 60; First Am. Compl. ¶ 53.) Instead, Defendant Loomis allowed Salters to remain unshackled and without any restraints in his hospital room for at least thirty minutes. (Second Am. Compl. ¶ 62; First Am. Compl. ¶ 53). Jane Doe III then

entered Salters' hospital room and observed him sitting unrestrained on the side of his hospital bed, after which she asked Defendant Loomis why Salters was not restrained. (Second Am. Compl. ¶ 61.) Defendant Loomis did not respond. (*Id*.) After Jane Doe III left, Salters grabbed Defendant Loomis' 9mm handgun and ran out of his hospital room onto the third floor despite Defendant Loomis' duty to protect and holster his firearm so that no one would be unable to gain access to it. (*Id*. ¶¶ 63-64; First Am. Compl. ¶¶ 43, 54-55.) Furthermore, Plaintiffs allege that after Defendant Loomis lost control of Salters, he did not protect or warn hospital staff, nurses, or patients. (Second Am. Compl. ¶¶ 65-66; First Am. Compl. ¶¶ 56-57.) Rather, Plaintiffs allege that Defendant Loomis ran from the situation and purposely hid in another hospital room. (Second Am. Compl. ¶ 64; First Am. Compl. ¶ 55.)

In the meantime, Salters went to an office where he took Jane Doe I hostage, forced her to remove her clothes, threatened her, and physically and verbally abused her while holding her at gunpoint. (Second Am. Compl. ¶ 67; First Am. Compl. ¶ 58.) Jane Doe II then entered the office, at which time Salters took her hostage at gunpoint forcing her to go to a "decontamination room" on the first floor of the hospital. (Second Am. Compl. ¶¶ 68, 69.) While forcing Jane Doe II at gunpoint, Jane Doe IV came upon Salters and Jane Doe II. (*Id*. ¶ 70.) Thereafter, Salters held Jane Doe II hostage in the decontamination room for over three hours at gunpoint, during which he repeatedly beat her, forced her to remove her clothes, violently raped her, threatened her life, and verbally abused her. (*Id*. ¶ 71.) For part of this time period, Jane Doe III was in close proximity to the hostage situation. (*Id*.) In the interim, a standoff ensued between Salters and Kane County S.W.A.T. team members while Salters was holding Jane Doe II hostage. (*Id*. ¶ 72.) At approximately 4:00 p.m. on May 13, 2017, the S.W.A.T. team members

shot and killed Salters. (*Id.* ¶ 73.) The bullet that struck and killed Salters also struck Jane Doe II. (*Id.*)

After Defendant Loomis lost control of Salters, Patient Plaintiff Weiland was able to hear screams from staff members whom Salters was holding hostage and then she called 911. (First Am. Compl. ¶¶ 59, 61.) Plaintiff Weiland remained in her windowless room on the third floor of the hospital for over an hour without knowing any information about her safety. (*Id.* ¶¶ 60-61.) Plaintiff Chrones was in a nearby hospital room on the third floor, could hear hostage negotiations, and had a direct line of sight to the S.W.A.T. team members – although hospital staff eventually moved her to another room during the standoff. (*Id.* ¶¶ 61-63.) The Patient Plaintiffs assert that they have suffered post-traumatic stress disorder as a result of these events. (*Id.* ¶ 66.) Plaintiff Weiland specifically alleges that she has been afraid to return to any medical facilities since the hostage standoff and Plaintiff Chrones alleges that she has suffered health problems based on her anxiety resulting from the incident. (*Id.* ¶¶ 67, 68.) Similarly, the Jane Doe Plaintiffs allege that they suffered emotional, as well as physical injuries, as a result of the hostage situation. (*Id.* ¶¶ 79, 87, Second Am. Compl. ¶¶ 83, 93, 111, 121, 139, 147, 160, 168.)

Plaintiffs further contend that during the relevant time period, Defendant Apex3 Security was a private Illinois security company responsible for the safety, security, and well-being of Delnor Community Hospital's staff and patients. (Second Am. Compl. ¶ 34; First Am. Compl. ¶¶ 25-26.) Specifically, Delnor Community Hospital hired Apex3 Security to provide security for those on the hospital's premises. (First Am. Compl. ¶¶ 26, 27.) According to Plaintiffs, Apex3 Security voluntarily provided security measures for those who were lawfully on the premises and was also tasked with monitoring inmates admitted to the hospital. (Second Am. Compl. ¶¶ 35-36; First Am. Compl. ¶¶ 28-29.) As part of the contract with Delnor Community

Hospital, Apex3 Security was to ensure that the Kane County Correctional Officers followed proper security protocols.  (Second Am. Compl. ¶ 36; First Am. Compl. ¶ 31.)

## ANALYSIS

### I.      Substantive Due Process Claims

#### A.      State-Created Danger Exception

Both the Jane Doe and Patient Plaintiffs bring claims based on their substantive due process right to bodily integrity against Kane County Correctional Officer Loomis under the state-created danger exception to *DeShaney v. Winnebago Cnty. Dep't of Social Serv.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).  *See Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (among the liberties protected by the due process clause is "a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security"). In *DeShaney*, the Supreme Court explained that as a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id*. at 197; *see also Paine v. Cason,* 678 F.3d 500, 508 (7th Cir. 2012) ("the Constitution is a charter of negative liberties rather than a source of rights to protection or treatment").  Put differently, "there is no federal constitutional right to be protected by the government against private violence in which the government is not complicit."  *Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 596 (7th Cir. 2008).  "Under the state-created danger doctrine, however, a substantive due process claim can proceed where the state 'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'"  *Wilson-Trattner v. Campbell,* 863 F.3d 589, 593 (7th Cir. 2017) (quoting *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015)); *see also Paine*, 678 F.3d at 510 ("state actors who, without justification, increase a person's risk of harm violate

the Constitution.").  Simply put, although "the state-created danger exception is a narrow one[,]"
it "applies where the state creates or increases a danger to an individual."  *Vill. of Arlington
Heights*, 792 F.3d at 917.  To prevail under the state-created danger exception to *DeShaney*, a
plaintiff must eventually show that "(1) the state by its affirmative acts created or increased a
danger to her, (2) the state's failure to protect her from danger was the proximate cause of her
injury, and (3) the state's failure to protect her shocks the conscience."  *Wilson-Trattner,* 863
F.3d at 593; *see also D.S. v. E. Porter Cnty. Sch. Corp.,* 799 F.3d 793, 798 (7th Cir. 2015).

### 1.    Affirmative Acts Creating or Increasing Danger

First, Defendants generally argue that state actors do not create or increase the danger of
private violence when an inmate escapes their custody.[2]  Although "the Constitution does not
create a right to be protected from criminal predators[,]" *Paine*, 678 F.3d at 507, the Court must
examine the detailed allegations and all reasonable inferences in Plaintiffs' favor to determine
whether they have plausibly alleged that Defendant Loomis affirmatively placed them in a
position of danger that they would not have otherwise faced.  *See Wilson-Trattner,* 863 F.3d at
593; *see also Paine*, 678 F.3d at 510 ("Several decisions in this and other circuits hold that
people propelled into danger by public employees have a good claim under the Constitution.").
In doing so, the Court turns to Plaintiffs' allegations concerning Defendant Loomis' affirmative
conduct when he lost control of Salters.

---

[2]  Defendants' reliance on *Town of Castle Rock v. Gonzales,* 454 U.S. 748, 768 (2005), is misplaced
because in *Castle Rock*, the Supreme Court held that the plaintiff did not have a due process property
interest in police enforcing a restraining order against her husband.  *See Sandage v. Bd. of Comm'rs of
Vanderburgh Cnty.,* 548 F.3d 595, 597 (7th Cir. 2008) ("The technical question was whether the State of
Colorado had created a property right in the enforcement of restraining orders.").  Here, Plaintiffs do not
argue that they have a constitutional property right to have another person jailed, *see id.*, but instead they
base their claims on the due process liberty interest in bodily integrity and the exceptions to *DeShaney*.
*See Labella Winnetka, Inc. v. Vill. of Winnetka,* No. 07 C 6633, 2009 WL 721136, at *6 (N.D. Ill. Mar.
18, 2009), *aff'd,* 628 F.3d 937 (7th Cir. 2010) ("Courts use the state created danger theory to analyze
substantive due process claims alleging a deprivation of a liberty interest relating to an individual's right
to bodily integrity, but not to analyze substantive due process claims relating to a deprivation of a
property interest.").

The Kane County Defendants argue that Plaintiffs' claims are based on Defendant Loomis' inaction – not his affirmative conduct – therefore, Plaintiffs have failed to sufficiently allege that Defendant Loomis created or increased any danger to them. *See Wilson-Trattner*, 863 F.3d at 596 ("Mere indifference or inaction in the face of private violence cannot support a substantive due process claim[.]"). As the Seventh Circuit explains, "'create or increase' must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect" because "[i]f all that were required was a causal relation between inaction and harm, the rule of *DeShaney* would be undone[.]" *Sandage*, 548 F.3d at 599.

Examining Plaintiffs' allegations and all reasonable inferences in their favor, they have alleged more than indifference or inaction on the part of Defendant Loomis. Specifically – in the context of Defendant Loomis' awareness that Salters was combative, manipulative, a flight risk, and that he posed a serious danger to the hospital staff and patients – while guarding Salters, Defendant Loomis unshackled him on more than one occasion and allowed Salters to use the bathroom unshackled and unsupervised. After leaving Salters unrestrained for approximately thirty minutes, Salters grabbed Defendant Loomis' gun. At that point, Defendant Loomis lost control of Salters. Plaintiffs allege that thereafter Defendant Loomis ran from the situation and purposely hid in another hospital room. Based on these allegations, Defendant Loomis' affirmative conduct of unshackling Salters for a substantial period of time provided Salters with the opportunity to grab his 9mm handgun and escape. Thus, unlike the facts in *Buchanan-Moore*, Salters was in custody when he escaped, whereas the perpetrator of the crimes in *Buchanan-Moore* had been released from custody and was on the Milwaukee streets when he committed the violent crimes at issue. *See Buchanan-Moore v. Cnty. of Milwaukee,* 570 F.3d 824, 825-26 (7th Cir. 2009). Also, that Defendant Loomis was indifferent to Jane Doe III's

question about Salters not being restrained and that Defendant Loomis failed to warn the hospital

staff after he lost control of Salters does not vitiate Plaintiffs' allegations of Defendant Loomis'

affirmative actions.  In other words, Defendants' characterization of Defendant Loomis' conduct

as merely "standing by and doing nothing" cannot prevail at this procedural posture where the

Court construes all facts and reasonable inferences in Plaintiffs' favor.  Moreover, the fact that

other Kane County Correctional Officers unshackled Salters and left him unrestrained for periods

of time does not make Defendant Loomis' affirmative actions any less egregious.  As such,

Plaintiffs have sufficiently alleged that Defendant Loomis' affirmative actions propelled them

into a danger that they would not have otherwise faced.  *See W. Bend Mut. Ins. Co. v.*

*Schumacher,* 844 F.3d 670, 675 (7th Cir. 2016) ("After *Twombly* and *Iqbal*, a plaintiff seeking to

survive a motion to dismiss must 'plead some facts that suggest a right to relief that is beyond the

speculative level.'") (citation omitted).

## 2.    Proximate Cause

Next, Defendants contend that Plaintiffs have failed to adequately allege proximate

cause.  To plausibly allege proximate cause, Plaintiffs must set forth sufficiently detailed facts

raising the inference that they were foreseeable victims of Defendant Loomis' actions in a tort

sense.  *See Buchanan-Moore*, 570 F.3d at 828.  Foreseeability depends on factors such as

whether the danger is "familiar and specific" and if "the immediate threat of harm has a limited

range and duration."  *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993).  In addition,

"[s]ome dangers are so evident, while their victims are so random, that state actors can be held

accountable by any injured party."  *Id.*  In short, proximate cause is a fact-specific inquiry,

involving "consideration of time, geography, range of potential victims, and the nature of harm

that occurred."  *Buchanan-Moore,* 570 F.3d at 829.

Here, Plaintiffs' factual allegations include that once Defendant Loomis created the dangerous situation by unshackling Salters, the threat of harm was immediate and limited in duration because Salters instantly began to commit violent crimes and continued to do so over the next three hours within the confines of the hospital. Plaintiffs' allegations also reflect that the geography and range of the victims was small, mainly, nurses who had treated Salters and were in close proximity to Salters after Defendant Loomis lost control of him, as well as patients on the same floor as Salters – as opposed to the public at large. Therefore, unlike the facts in *Buchanan-Moore,* the range of potential victims and the particularized setting of the hospital do not amount to "a generalized, amorphous zone of danger." *Buchanan-Moore,* 570 F.3d at 828. In addition, the serious dangers posed by pretrial detainees – let alone escaped pretrial detainees – are both "familiar and specific." *See, e.g., Flores v. Sheriff of Cook Cnty.*, No. 10 C 8040, 2014 WL 1031494 (N.D. Ill. Mar. 18, 2014); *Fairley v. Andrews*, 430 F. Supp. 2d 786 (N.D. Ill. 2006). Therefore, Plaintiffs have adequately alleged that they were more than "random victims" or that their injuries were "too remote" as Defendants argue. *See Reed*, 986 F.2d at 1127 (7th Cir. 1993) ("[w]hen the police create a specific danger, they need not know who in particular will be hurt."). In summary, Plaintiffs' allegations are sufficiently particularized to withstand Defendants' Rule 12(b)(6) motions to dismiss.[3]

### 3. Shocks the Conscience

Further, Defendants assert that Plaintiffs have not adequately alleged that Defendant Loomis' conduct "shocks the conscience." The Supreme Court has held that state action shocks

---

[3] Defendant Kane County's argument that the Plaintiffs who did not suffer "physical violence at the hands of Salters" cannot bring substantive due process claims is not supported by the legal authority it cites. Moreover, "the protections of the Due Process Clause against arbitrary intrusions on personal security include both physical and emotional well-being." *White v. Rochford*, 592 F.2d 381, 385 (7th Cir. 1979); *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) ("compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'") (citation omitted).

the conscience if it is "arbitrary in the constitutional sense" and that only "the most egregious official conduct" satisfies this stringent standard. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). As the Seventh Circuit explains, "[m]aking a bad decision, or even acting negligently, does not suffice to establish the type of conscience-shocking behavior that results in a constitutional violation." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654-55 (7th Cir. 2011). "[W]hile the 'shocks the conscience' standard lacks precise measurement, only conduct falling towards the more culpable end of the tort law spectrum of liability will be found to shock the conscience." *Id.* at 655. To clarify, "when the circumstances permit public officials the opportunity for reasoned deliberation in their decisions, we shall find the official's conduct conscience shocking when it evinces a deliberate indifference to the rights of the individual." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007). Under the Fourteenth Amendment, deliberate indifference amounts to "conscious disregard of known or obvious dangers." *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998) (citation omitted). "On the other hand, where circumstances call for hurried judgments in order to protect the public safety or maintain the public order, and thereby render reasoned deliberation impractical, conduct must reach a higher standard of culpability approaching malicious or intentional infliction of injury before we shall deem official conduct conscience shocking." *King,* 496 F.3d at 819. As the Supreme Court in *Lewis* explained, "attention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in the one case is less egregious in the other (even assuming that it makes sense to speak of indifference as deliberate in the case of sudden pursuit)." *Lewis*, 523 U.S. at 851. As such, "because the state actor's conduct is evaluated along a spectrum of

culpability, any analysis of potentially conscience-shocking behavior is necessarily fact-driven." *Jackson*, 653 F.3d at 655.

Viewing the allegations as true and all reasonable inferences in Plaintiffs' favor, Defendant Loomis had the opportunity for reasoned deliberation in deciding to unshackle Salters allowing him to move freely around the hospital room for a substantial period of time, despite the fact that Defendant Loomis knew Salters was a violent, convicted felon. Defendant Loomis' conduct of losing control of Salters and then running and hiding after Salters grabbed his gun evinced deliberate indifference because Defendant Loomis consciously disregarded "known or obvious dangers." Accordingly, Plaintiffs have sufficiently alleged that Defendant Loomis' conduct "shocks the conscience." *See Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Thus, the Jane Doe and Patient Plaintiffs have adequately alleged their substantive due process claims under the federal pleading standards.

### B. Qualified Immunity

Defendants also argue that Correctional Officer Loomis is shielded by the affirmative defense of qualified immunity. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 138 S.Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U. S. 658, 664 (2012)); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S.Ct. at 589. "It is not enough that the rule is suggested by then-existing precedent," rather the "precedent must be clear enough that every

reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id*. at 590. "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. "Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).

As discussed directly above, Plaintiffs have adequately alleged that Defendant Loomis violated their constitutional rights, therefore, the Court turns to whether the unlawfulness of Defendant Loomis' conduct was clearly established on May 13, 2017. When assessing the clearly established prong of qualified immunity "the inquiry is aimed at determining whether a reasonable person in the officer's position would have understood his actions to be against the law at the time he acted." *Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir. 2017). To carry their burden, Plaintiffs must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Id*. (quoting *Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir. 1997)).

In general, "[i]t is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution." *Paine*, 678 F.3d at 510; *see also Regalado v. City of Chicago,* 40 F. Supp. 2d 1009, 1016 (N.D. Ill. 1999) ("state-created-danger claims were recognized by our Court of Appeals for more than a decade before the 1991 incident" at issue). That being said, Defendants argue that "no controlling case would have told Loomis that he could not unshackle Salters so that Salters could use the bathroom." (R. 38, Opening Brief, at

14.)  Specifically, Defendant Loomis asserts that "[r]esearch has not revealed a case 'analogous'

to this one, where a guard unshackled an inmate so that the inmate could use the toilet, the

inmate then overpowered the guard, and then the inmate committed more violent crimes."  (*Id.* at

15.)  Although courts should not define clearly established law at a high level of generality, *see*

*Wesby*, 138 S.Ct. at 590, "[t]his requirement does not mean that a plaintiff must be able to point

to a case 'on all fours' with the defendant officer's alleged misconduct."  *Canen,* 847 F.3d at

412.  Instead, "there must be settled authority that would cause him to understand the illegality of

the action."  *Id.*  Therefore, Plaintiffs need not point to an analogous case where "a guard

unshackled an inmate so that the inmate could use the toilet, the inmate then overpowered the

guard, and then the inmate committed more violent crimes" to survive Defendants' motions to

dismiss based on qualified immunity.  *See Vaughn v. City of Chicago*, No. 14 C 47, 2014 WL

3865838, at *4 (N.D. Ill. Aug. 5, 2014) ("When determining whether a state-created danger

claim alleges the violation of a clearly established right, the Seventh Circuit does not demand

precise factual symmetry between the precedent(s) relied upon and the facts at hand.").

The Court thus turns to whether the law at the time of Defendant Loomis' conduct was

sufficiently clear such that a reasonable officer would understand that his actions were unlawful.

*See Wesby,* 138 S.Ct. at 589.  "In this circuit, a recognition of a claim based on a state-created

danger precedes *DeShaney*, which was decided in 1989."  *Monfils v. Taylor*, 165 F.3d 511, 518

(7th Cir. 1998) (citing *White v. Rochford,* 592 F.2d 381, 382 (7th Cir. 1979)).  Indeed, since

1979, the Seventh Circuit has concluded that the state-created exception applies when law

enforcement officers encounter potential dangers and then turn them into actual ones – leaving

the plaintiffs in a worse position than before the police acted.  *See White,* 592 F.2d at 382 (police

arrested driver for drag racing on Chicago Skyway leaving children passengers stranded alone in

the car); *Reed,* 986 F.2d at 1127 (police officers arrested a sober driver leaving behind a drunk

passenger, who later caused a collision that killed another person); *Monfils*, 165 F.3d at 518

(police promised that recording of a tip would remain anonymous, but nonetheless gave

recording to suspect, who then murdered informant); *Paine*, 678 F.3d at 511 (police arrested a

woman in public airport and released her in a high crime area at night where she was assaulted).

"[I]n each of these cases, the plaintiff was safe, or at least considerably safer, before the police

acted than he or she was thereafter." *Vill. of Arlington Heights,* 782 F.3d at 917.

Plaintiffs' allegations and all reasonable inferences indicate that Defendant Loomis was

aware of Salters' violent propensities and the increased dangers to those nearby if Defendant

Loomis lost control of Salters. Had Defendant Loomis not lost control of Salters, Jane Does I

and II would not have been held hostage at gunpoint and brutalized and the other Plaintiffs

would not have been terrorized by Salters wreaking havoc at the hospital causing a hostage

situation and resultant police standoff. Based on *White*, *Reed*, *Monfils*, and *Paine*, the law at the

time of Defendant Loomis' alleged misconduct was sufficiently clear that a reasonable officer

would understand that his actions were unlawful. The Court therefore denies Defendants'

motions to dismiss in this respect.

### C.      Loss of Consortium

In Counts II and VIII of the Second Amended Complaint, John Doe I and John Doe II

bring constitutional loss of consortium claims based on the substantive due process violations

alleged by Jane Doe I and Jane Doe II. Loss of consortium claims, however, are not recognized

as constitutional deprivations under 42 U.S.C. § 1983. *See Niehus v. Liberio*, 973 F.2d 526, 534

(7th Cir. 1992) ("Deprivations of the lesser services comprehended in the portmanteau term

'consortium' are not deprivations of liberty within the restricted meaning that the term bears in

the Constitution."); *see also Russ v. Watts,* 414 F.3d 783, 791 (7th Cir. 2005) (parents had no

"constitutional right to recover for the loss of society and companionship of an adult child");

*Fluker v. Cnty. of Kankakee*, No. 11-2254, 2012 WL 3029025, at *5 (C.D. Ill. June 1, 2012)

("the Seventh Circuit has not endorsed the validity of a spouse's loss of consortium claims

brought under § 1983").  Therefore, the Court grants Defendant Kane County's motion to

dismiss the § 1983 loss of consortium claims alleged in Counts II and VIII of the Second

Amended Complaint, along with the attendant indemnification claims against Kane County in

Counts VI and X.

## II.      Common Law Negligence Claims

Plaintiffs also bring common law negligence claims (and loss of consortium tort claims)

against Defendants Apex3 Security and Delnor Community Hospital.  To prove a negligence

claim under Illinois law, "a plaintiff must establish the existence of a duty, the defendant's

breach of that duty, and that the breach proximately caused the plaintiff's resulting injuries."

*Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018); *Smith v. United States,* 860 F.3d 995,

998 (7th Cir. 2017).  Here, the parties' arguments focus on whether Apex3 Security owed

Plaintiffs a duty to protect them from Salters' criminal acts.  "Whether a duty exists is a question

of law to be determined by the court."  *Dunn v. Menard, Inc.*, 880 F.3d 899, 906 (7th Cir. 2018).

"It has long been established that under common law, 'the universally accepted rule ... is that a

private person has no duty to act affirmatively to protect another from criminal attack by a third

person absent a 'special relationship' between the parties.'"  *Vesely v. Armslist LLC*, 762 F.3d

661, 665 (7th Cir. 2014) (citation omitted).  "Illinois recognizes four special relationships: (1)

common-carrier passenger; (2) innkeeper and guest; (3) custodian and ward; and (4) business

invitor and invitee." *Id*.; *see also Sanchez v. Wilmette Real Estate & Mgmt. Co.*, 404 Ill. App. 3d 54, 60 (1st Dist. 2010).

The parties do not dispute that there was a "special relationship" between Salters as a pretrial detainee and the Kane County Sheriff's Office as custodian pursuant to the Illinois County Jail Act. *See* 730 ILCS 125/2. As the Supreme Court of Illinois teaches, "[t]he Act designates the county sheriff as the warden of the local county jail and, as jail warden, the sheriff has custody of all prisoners in the jail." *People v. Hunt,* 234 Ill. 2d 49, 59-60 (Ill. 2009). Moreover, under the County Jail Act:

> Any place to which the prisoners are so removed shall, during their imprisonment there, be deemed, as to such prisoners, a prison of the county in which they were originally confined; but, they shall be under the care, government and direction of the Warden of the jail of the county in which they are confined.

730 ILCS 125/14.

Relying on the County Jail Act, however, Defendant Apex3 Security argues that Salters was in the exclusive and sole custody of the Kane County Sheriff's Office, and thus it had no duty to protect individuals on the hospital's premises from Salters' criminal conduct. Apex3 Security specifically asserts that "[p]rivate security contractors hired by hospitals have no duty to prevent inmates or pre-trial detainees from committing violent criminal acts against others, in part, because those inmate patients are under the exclusive custody of their prospective county sheriff." (R. 30, Opening Brief, at 4; R. 40, Opening Brief, at 5.) In support of this argument, Apex3 Security relies on an Illinois Appellate Court case decided in 1975. *See St. Mary of Nazareth Hosp. v. City of Chicago*, 29 Ill. App. 3d 511, 516 (1st Dist. 1975). In *St. Mary of Nazareth*, the Illinois Appellate Court relied on the County Jail Act, including Ill.Rev.Stat. Ch. 75, ¶ 117, when it concluded that the "Sheriff of Cook County was responsible for the custody" of a pretrial detainee and the detainee was in "the technical custody of him" in relation to a

private hospital bringing an action against Cook County to recover the detainee's medical expenses. *Id.* at 515-17. Based on the sections of the County Jail Act enacted during the relevant time period, the Illinois Appellate Court concluded that Cook County was solely liable for the detainee's hospital bill, even though a Chicago Police Officer transported the detainee to the hospital. *Id*. at 517. Since the 1975 decision in *St. Mary of Nazareth,* however, the relevant statutory language in the County Jail Act has changed providing that "[a]n arresting authority shall be responsible for any qualified medical expenses relating to the arrestee until such time as the arrestee is placed in the custody of the sheriff." *OSF Healthcare Sys. v. Cnty. of Lee,* 239 Ill. App. 3d 824, 830 (2d Dist. 1993); *see also* 730 ILCS 125/17.

Based on *St. Mary of Nazareth*, Apex3 Security argues that it "had no authority to control or direct either the Kane County Sheriff's deputy or Salters." (Opening Brief, at 5.) The Illinois Appellate Court in *St. Mary of Nazereth*, however, did not hold as such. In fact, the Court could not find any legal authority supporting Apex3 Security's theory that only the County can be liable under the circumstances pursuant to the Illinois County Jail Act or otherwise. Apex3 Security's argument that "[j]ust because an inmate like Salters is admitted to a hospital for emergency medical treatment, as required by federal and state law, does not mean that the hospital and its security staff voluntarily accepted or undertook any duty" is also untethered from any legal authority. The Court also notes that Apex3 Security is attempting to add facts to Plaintiffs' allegations by stating it had no authority or control in relation to Salters despite Plaintiffs' allegations to the contrary. *See Smith v. Burge,* 222 F.Supp.3d 669, 691 (N.D. Ill. 2016) ("defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations") (citation omitted).

On the other hand, Plaintiffs contend that Apex3 Security had a duty to protect them because it voluntarily and contractually undertook the duty to provide security for the hospital's patients and staff. Indeed, under Illinois law, "a defendant may be liable for the criminal actions of third parties if it voluntarily undertakes to protect against such activity by providing security measures." *McKenna v. AlliedBarton Sec. Servs., LLC,* 35 N.E.3d 1007, 1015 (1st Dist. 2015); *see also O'Brien v. City of Chicago,* 285 Ill. App. 3d 864, 874 (1st Dist. 1996) ("The voluntary undertaking theory generally has been recognized when one party agrees to provide security services for another."). To clarify, '[i]n situations in which a duty would not otherwise arise, a duty to act reasonably may be imposed when a defendant negligently performs a voluntary undertaking." *Thornton v. M7 Aerospace LP,* 796 F.3d 757, 768 (7th Cir. 2015); *see also LM ex rel. KM v. United States,* 344 F.3d 695, 700 (7th Cir. 2003) ("Illinois recognizes an affirmative duty of care independent of a special relationship … where a voluntary undertaking is shown."); *Wakulich v. Mraz,* 203 Ill. 2d 223, 241 (2003) ("pursuant to the voluntary undertaking theory of liability, 'one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking."). "Once a voluntary undertaking exists, it must be performed with reasonable care[,]" *KM,* 344 F.3d at 701, and the "extent of the duty imposed on one who voluntarily undertakes to perform an act is limited to the extent of the undertaking." *Thornton*, 796 F.3d at 768.

Construing their well-pleaded allegations as true and all reasonable inferences in their favor, Plaintiffs allege that during the relevant time period, Defendant Delnor Community Hospital and Apex3 Security entered into a voluntary contract in which Apex3 Security would provide security and safety measures for those on the hospital's premises, including staff, nurses,

and patients.  Further, Plaintiffs allege that Defendant Apex3 Security voluntarily contracted to monitor the detainees and inmates admitted to the hospital and to ensure that the Kane County Correctional Officers followed proper security protocols.  Plaintiffs maintain that Apex3 Security was on notice that the Kane County Correctional Officers violated certain policies by leaving Salters unshackled and unattended on at least one occasion.  These allegations – viewed in Plaintiffs' favor – plausibly state that Apex3 Security had a duty to protect Plaintiffs from harm, including Salters' criminal conduct, based on Apex3 Security's voluntary undertaking.  *See Iqbal,* 556 U.S. at 678 (a complaint is plausible on its face when plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  In other words, Plaintiffs' allegations have provided enough factual details to "present a story that holds together."  *Catinella v. Cnty. of Cook, Illinois,* 881 F.3d 514, 517 (7th Cir. 2018).  The actual scope of Apex3 Security's voluntary undertaking is a question best left for summary judgment.  *See, e.g., Blankenship v. Securitas Sec. Servs. USA, Inc.,* 21 N.E.3d 1259, 1265 (1st Dist. 2014); *Aidroos v. Vance Uniformed Prot. Servs., Inc.*, 386 Ill. App. 3d 167, 173 (1st Dist. 2008); *Castro v. Brown's Chicken & Pasta, Inc.*, 314 Ill. App 3d 542, 547 (1st Dist. 2000).  The Court therefore denies Apex3 Security's motions to dismiss the negligence and loss of consortium claims brought against it by the Doe and Patient Plaintiffs.[4]

Next, although the Patient Plaintiffs allege a negligence claim against Defendant Delnor Community Hospital in Count III of their First Amended Complaint, in their legal memoranda, they do not provide any explanation how or why the hospital had a legal duty to protect them in order to maintain their negligence claim against the hospital.  To clarify, the Patient Plaintiffs joined the Doe Plaintiffs' response brief to Apex3 Security's motions to dismiss and the Doe Plaintiffs' brief did not address whether Delnor Community Hospital had a legal duty to protect

---

[4] In its reply brief, Apex3 Security withdrew its arguments under the Illinois Workers' Compensation Act.

the Patient Plaintiffs.  Moreover, it is well-settled in this Circuit that it is not the Court's role to make parties' legal arguments for them.  *See Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them."); *see also Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017) ("the failure to reply to an adversary's point can have serious consequences") (citation omitted).  As such, the Patient Plaintiffs have forfeited their negligence claim against the hospital for failing to respond to Defendant Delnor Community Hospital's legal arguments.  *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) ("by failing to respond in any way to any of the arguments advanced by Defendants regarding counts 9, 14, 15, and 16, Plaintiffs have waived their claims"); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) ("Because [plaintiffs] did not provide the district court with any basis to decide their claims, and did not respond to the [defendant's] arguments, these claims are waived.").  A "plaintiff who forfeits his claims does not get a chance to replead." *Boogaard v. Nat'l Hockey League*, 255 F. Supp. 3d 753, 766 (N.D. Ill. 2017); *see, e.g., Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1043 (7th Cir. 1999) ("by failing to respond responsively to the motion to dismiss" plaintiff "forfeited her right to continue litigating her claim."); *see also Baker v. Chisom*, 501 F.3d 920, 926 (8th Cir. 2007) (affirming dismissal with prejudice where plaintiff "failed to defend that claim or urge that it be dismissed without prejudice"); *Lee v. Chicago Youth Ctrs.*, 69 F. Supp. 3d 885, 887 n.1 (N.D. Ill. 2014) ("Parties should not have a second go at an issue that was raised in the original briefing and which they had every incentive and opportunity to brief.").  As such, the Court grants Defendant Delnor Community Hospital's motion to dismiss Count III of the First Amended Complaint.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendant Kane County's Rule 12(b)(6) motion to dismiss Plaintiffs' Second Amended Complaint in case number 17 C 3944. [dkt. 34]. The Court denies Defendant Kane County's motion to dismiss Plaintiffs' First Amended Complaint in case number 17 C 6331. [dkt. 25]. Also, the Court denies Defendants Loomis' and Apex3Security's motions to dismiss in both cases. [17 C 6331, dkt. 29, 31; 17 C 3944, dkt. 37, 39]. Last, the Court grants Defendant Delnor Community Hospital's motion to dismiss Count III of the First Amended Complaint in 17 C 6111. [dkt. 27].

**Dated:** April 11, 2018

ENTERED

AMY J. ST. EVE
United States District Judge